IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 14-CV-02403-MSK-MJW

AARON S. RABIDUE,

    Plaintiff,

v.

NICOLE BLATNICK;
TINA ROSLER;
ALVIN MASSENBURG;
JENNIFER NOVATNY;
HONG DANG; and
DEPUTY DIRECTOR OF PRISONS JOHN DOE,[1]

    Defendants.

---

## OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment (**# 96**), the Plaintiff's Response (**# 100**), and the Defendants' Reply (**# 103**). For the following reasons, the motion is granted, in part, and denied, in part.

### I. BACKGROUND[2]

On January 31, 2014, Plaintiff Aaron Rabidue, an inmate at the Limon Correctional Facility (Limon), complained of intense pain in his left foot to nurse and health services

---

[1] Mr. Rabidue has not served Deputy Director of Prisons John Doe, whom he also refers to as the Deputy Director of Clinical Services in his Amended Complaint. # 10 at 1, 4. Mr. Rabidue is directed to show cause why John Doe should not be dismissed under Federal Rule of Civil Procedure 4(m) for failure to serve with 14 days of this Order.

[2] The Court recounts the facts in the light most favorable to Mr. Rabidue, the nonmoving party. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002). In large part, the parties do not dispute the material facts; the Court notes in footnotes where a relevant dispute exists.

1

administrator for the Limon clinic, Nicole Blatnick.  Nurse Blatnick consulted with Alvin Massenburg, a physician's assistant (P.A.), completed a nursing protocol for sprains, and gave Mr. Rabidue an Ace bandage and Ibuprofen.  Thereafter, Mr. Rabidue requested crutches, a housing restriction that would put him on the first floor, and a medical lay-in that would allow him to stay in his cell and have food delivered (collectively referred to as his requested "accommodations"). These requests were denied.

Mr. Rabidue returned to the Limon clinic on February 4 and was examined by Nurse Tina Rosler.[3]  He told her that his pain was increasing, it was keeping him up at night, and the Ibuprofen was not working.  Nurse Rosler consulted with P.A. Massenburg, and then ordered that x-rays be taken of Mr. Rabidue's foot and ankle.  She provided Mr. Rabidue with Motrin for the pain, but denied the requested accommodations.  The x-rays were taken February 5; the Motrin ran out on February 8.

Mr. Rabidue returned again to the Limon clinic on February 11 complaining of extreme pain.  He was again examined by Ms. Rosler.  Again, he requested accommodations.  In consultation with P.A. Massenburg, Ms. Rosler rejected these requests, but gave Mr. Rabidue two doses of Tylenol 3.

The next day, Mr. Rabidue attended a previously scheduled appointment with P.A. Massenburg to discuss a spinal injury.  Noting decreased sensation in Mr. Rabidue's foot, P.A. Massenburg prescribed Neurontin to address any nerve-related pain.  Mr. Rabidue again requested accommodations, and P.A. Massenburg again refused.

P.A. Massenburg also met with Mr. Rabidue two days later to discuss his x-ray results.

---

[3] Although Nurse Rosler has since married and changed her surname to Cullyford, for purposes of consistency with the pleadings in this action, the Court will refer to her as Nurse Rosler.

The x-rays revealed a mild expansion of the diaphysis[4] of the fifth metatarsal bone in his left foot. P.A. Massenburg asked if Mr. Rabidue could remember any incident that would have caused a fracture; he could not think of any. Mr. Rabidue again requested accommodations, which P.A. Massenburg denied. P.A. Massenburg told him to keep wearing the Ace bandage.

On March 4, Mr. Rabidue "heard a popping and cracking sound" when he stepped on his left foot. He came to the clinic complaining of a sharp and intense pain. P.A. Massenburg ordered more x-rays of Mr. Rabidue's foot and authorized his use crutches, but continued to reject Mr. Rabidue's request for a housing restriction and lay-in. Ultimately, Mr. Rabidue did not utilize the authorized crutches for reasons that the parties dispute.[5]

The second set of x-rays came back on March 11. Observing them, P.A. Massenburg determined that Mr. Rabidue had multiple fractures in his left foot. He then ordered an outside consultation with an orthopedic doctor, and for the intervening time period provided Mr. Rabidue a "post-op" shoe with a hard and flat bottom and pain medication. None of the other requested accommodations were authorized. Mr. Rabidue asked for more effective medication but was refused. The post-op shoe did not improve Mr. Rabidue's pain.

Still in pain, Mr. Rabidue asked for a meeting with Nurse Blatnick in her capacity as health services administrator to complain about the treatment he was receiving. The meeting was held on March 18. It was Nurse Blatnick's normal practice to review an inmate's medical records before a meeting, but apparently she did not do so. Nurse Blatnick told Mr. Rabidue that sprains

---

[4] The diaphysis is the "elongated rodlike structure" between two ends of a bone. *See* Stedman's Medical Dictionary 533 (28th ed. 2006).

[5] Both medical records and P.A. Massenburg's deposition testimony indicate that Mr. Rabidue, after receiving a crutch, left it on the clinic counter, implying that he "didn't want to be tempted to use it the wrong way." Mr. Rabidue, however, insists that he never said that and contends that Nurse Rosler made up the story to deny him the use of crutches.

can take weeks to heal, even though he told her he did not have a sprain but had a fracture. When he tried to show her his medical records reflected a fracture, she threatened to end the meeting. He also informed her that his prescriptions had run out before they were refilled. Nurse Blatnick told him she would talk to P.A. Massenburg about the medications and she would meet with him afterward. When Nurse Blatnick met again with Mr. Rabidue on March 24, she had not spoken with P.A. Massenburg.

On March 25, P.A. Massenburg met with Mr. Rabidue and prescribed a 14-day supply of pain medication, but continued to refuse any of his requested accommodations. The prescription ran out April 8 and apparently was not renewed.

On April 14, Mr. Rabidue again heard a snapping sound when he stood on his left foot. He complained to Nurse Hong Dang that he was concerned he had broken his foot and he wanted an x-ray. Nurse Dang refused an immediate x-ray, telling him he had to wait for his appointment with the orthopedic doctor. Mr. Rabidue again requested accommodations, but Nurse Dang replied, "no tray, no provider, no meds, no ice, and definitely no crutches!". She then conducted the protocol to assess a sprain.[6] On the written protocol there was a box entitled "Possible fracture" listed under "Findings Requiring IMMEDIATE Referral". The marking of this box would have resulted in an immediate referral to an outside provider. Nurse Dang did not check the box because there was no outside provider on-site that day. Instead, she checked a box for "Finger or toe injury with no obvious deformity to provider at next work day" which did not

---

[6] Both medical records and Ms. Dang's deposition testimony indicate that Mr. Rabidue was given Tylenol at the April 14 visit to the Limon clinic. It is not completely clear from Mr. Rabidue's declaration whether Ms. Dang refused all treatment or did, in fact, give him Tylenol. It is clear, however, from Ms. Dang's medical record entries that there is a dispute over whether she observed Mr. Rabidue walking fine that evening in the medication line, as Mr. Rabidue avers he "was not receiving medication at that time."

require an immediate referral.

Mr. Rabidue saw an orthopedic specialist three days later on April 17. Dr. Merribeth Bruntz took x-rays and determined that Mr. Rabidue had four fractured metatarsal bones in his left foot. Dr. Bruntz gave him a walking boot that immobilized his foot. The fractures healed over the course of the next 14 weeks.

Mr. Rabidue brought this action suit in August 2014, proceeding without the assistance of counsel. In his Amended Complaint, he alleges two Eighth Amendment claims and seeks relief under 42 U.S.C. § 1983. Specifically, he avers that the Defendants were deliberately indifferent to his medical needs by (1) failing to provide effective pain medication; and (2) failing to impose limitations on his physical activity. The Defendants moved to dismiss these claims in February 2015. On referral from the Court, the Magistrate Judge recommended dismissal of Mr. Rabidue's first claim. In addition, the Magistrate Judge recommended that both claims be dismissed to the extent that the remedy sought was an award of monetary damages from the Defendants in their official capacities. The Court adopted this recommendation in July 2015. Counsel was appointed for Mr. Rabidue in January 2016. The Defendants now move for summary judgment.

## II.  LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis*

5

*Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus. Inc. v. Arvin Indus. Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### III. DISCUSSION

As an initial matter, Mr. Rabidue concedes that Defendant Jennifer Novatny's involvement in the alleged course of events is too remote to sustain a claim of deliberate indifference against

6

her. Thus, the claim against Ms. Novatny is dismissed, with prejudice.

**A.    Qualified Immunity**

All of the remaining Defendants invoke the doctrine of qualified immunity. Qualified immunity protects individual state actors from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Because of the underlying purposes of qualified immunity, the Court treats qualified-immunity questions differently from other questions on summary judgment. *See Thomas v. Durastanti*, 607 F.3d 655, 662 (10th Cir. 2010). After a defendant asserts qualified immunity, the burden shifts to the plaintiff, who must: (1) show facts that "make out a violation of a constitutional right," and (2) establish that, at the time of the conduct at issue, it was clearly established under existing law that the defendant's conduct breached the constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court may address these questions in whichever order is best suited to the case. If the plaintiff fails to satisfy either prong of this inquiry, the Court "must grant the defendant qualified immunity." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001). However, if the plaintiff establishes the violation of a clearly established right, it becomes the defendant's burden to prove is no genuine issue of material fact and that she is entitled to judgment as a matter of law. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

For all practical purposes, the first question is indistinguishable from the inquiry that the Court would make in determining whether the Plaintiff has come forward with sufficient evidence to establish a *prima facie* claim in accordance with Fed. R. Civ. P. 56. The plaintiff must show sufficient evidence to demonstrate the existence of a cognizable claim. The Court considers the evidence in the light most favorable to the plaintiff and assesses whether it is sufficient to

7

demonstrate the violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The "clearly established" inquiry focuses on whether the contours of the constitutional right were so well-settled in the context of the particular circumstances, that a "reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). To satisfy this prong, the burden is on the plaintiff to point to Supreme Court or Tenth Circuit precedent (or the clear weight of other circuit courts) that recognizes an actionable constitutional violation in the circumstances presented. *Schwartz v. Booker*, 702 F.3d 573, 587–88 (10th Cir. 2012); *see also Thomas*, 607 F.3d at 669 (plaintiff bears the burden of citing to requisite authority). It is not necessary for the plaintiff to point to a case with identical facts, but he must identify some authority that considers the issue "not as a broad general proposition," but in a "particularized" sense — for example, it is not sufficient to ask whether it is "clearly established" that the Fourth Amendment prohibits the use of excessive force in effecting an arrest; rather, the court examines whether that constitutional principle has previously been found to prohibit particular conduct. *See, e.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 198–200 (2004).

With these considerations in mind, the Court turns to Mr. Rabidue's claim that the Defendants were deliberately indifferent to his medical needs. Although stated as a single claim, from an analytical perspective, the claim is stated against each Defendant individually. The Court begins its consideration with a determination of whether a *prima facie* claim has been stated.

**B.  Claims Under the Eighth Amendment**

The Eighth Amendment requires jail officials "to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmate's safety." *Barney v. Pulsipher*, 153 F.3d 1299, 1310 (10th Cir. 1998). It is well established that prison officials violate

the Eighth Amendment if their deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, a claim based on an inadvertent failure to provide adequate medical care or alleging that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Rather, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

For a *prima facie* Eighth Amendment violation, an inmate must show both objective and subjective indifference to his medical needs. Objective indifference is demonstrated by showing that the inmate had a "sufficiently serious" medical need. *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001). Subjective indifference requires evidence that a defendant acted with a culpable state of mind; that is, with knowing or conscious disregard of the medical need or with recklessness. *Self*, 439 F.3d at 1230–31. An inmate may demonstrate a medical provider's culpable state of mind by presenting evidence that the provider knew of the inmate's serious medical condition (or such condition was obvious) but nevertheless delayed treatment, referral, or examination. Deliberate indifference does not require a showing of express intent to harm, rather, it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005); *see also Farmer v. Brennan*, 511 U.S. 825, 836 (1994). A prison medical professional who serves solely as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if he or she delays or refuses to fulfill that gatekeeper role. *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000)).

C.  **Constitutional Violation Analysis**

Because the Defendants do not contest that Mr. Rabidue had a serious medical condition, the objective standard is satisfied. The question is whether the Defendants were subjectively indifferent.[7]

The Defendants argue that they did not act with deliberate indifference, but treated Mr. Rabidue appropriately given their good-faith assessments. They insist that they evaluated his medical conditions and provided treatment as to the symptoms that were presented. Mr. Rabidue responds that P.A. Massenburg knew of the risks of additional injury and disregarded them by repeatedly failing to prescribe any treatment that would cause him to walk less. As to Nurses Blatnick, Rosler, and Dang, he contends that they served in a gatekeeper capacity and failed to fulfill the gatekeeper role by obstructing his ability to get the care he needed from a provider.

Because the subjective element of the deliberate-indifference analysis turns on evidence that the Defendants acted with a knowing or conscious disregard of Mr. Rabidue's medical need, the chronology of events is important. There is a clear distinction between the treatment Mr. Rabidue received before and after March 11, 2014, when the second set of X-rays confirmed a fracture in Mr. Rabidue's foot.

  1.  *Through March 11*

The Court finds that no Defendant was deliberately indifferent to Mr. Rabidue's medical needs before March 11. Until February 14, when Mr. Rabidue's first set of x-rays came back, there was no indication that he had suffered a fracture in his left foot. Nurse Blatnick, Nurse

---

[7] The Defendants urge adoption of a third element to the deliberate-indifference standard that requires the plaintiff to show he was substantially harmed. But this "element" is actually a component of the first element, a tool to help the Court determine whether a delay in treatment objectively constituted a sufficiently serious condition. Because the Defendants did not contest the objective element, the degree of harm to Mr. Rabidue is irrelevant.

Rosler, and P.A. Massenburg were attentive to his complaints of pain and responded with appropriate (if not quite efficacious) treatments. Although he was denied the accommodations he desired, it was not clearly apparent that his injury warranted those he requested. Nurse Rosler and P.A. Massenburg ordered x-rays to determine the necessity for these treatment options. It was not unreasonable for the Defendants to wait on the x-rays to prescribe additional treatment or accommodations. In light of these facts, Mr. Rabidue's claim really is premised upon his preference for different medical treatment — the requested accommodations that would have kept him off of his foot. Unfortunately for Mr. Rabidue, the Eighth Amendment does not guarantee any right to a particular course of treatment. *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006); *see also Estelle*, 429 U.S. at 107.

After February 14, the Defendants who saw Mr. Rabidue had evidence of a structural change in his foot. However, it is undisputed that the condition was mild. P.A. Massenburg testified in his deposition that the diaphysis he observed on the first set of x-rays was akin to mild changes resulting from a previous injury; he thought Mr. Rabidue's bone may have moved a bit, but observed no fracture. In other words, though the x-rays revealed *evidence* of a fracture, P.A. Massenburg noted the evidence, evaluated it, but reached a different conclusion as to what that evidence signified about Mr. Rabidue's condition (*i.e.* that he was experiencing residual pain from a past injury, not active pain from a current injury). Although medical professionals might disagree as to treatment, the record reflects that P.A. Massenburg rendered the degree of treatment that he subjectively believed Mr. Rabidue's x-rays justified. Although a fact issue exists as to why Mr. Rabidue was denied a crutch on March 4, there is no evidence that the crutch was necessary medical treatment. The Defendants who saw Mr. Rabidue were clearly responsive to his worsening symptoms on March 4, ordering more x-rays.

Once the second set of x-rays were received on March 11, however, the cause of Mr. Rabidue's pain became obvious — multiple fractures. P.A. Massenburg provided the post-op shoe and ordered an outside consultation with an orthopedic doctor. Reasonable minds might disagree over whether the post-op shoe was the right course of treatment, but disagreements among medical providers as to the optimal course of action do not result in subjective disregard of medical conditions. *See Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986). It is sufficient to observe that, when confronted with new evidence about the nature of Mr. Rabidue's injury, P.A. Massenburg altered his course of treatment, responding to a specific injury with more specific treatments. This is not evidence of subjective deliberate indifference.

   2.   *After March 11*

As an initial matter, the Court must resolve Mr. Rabidue's contention that Nurses Blatnick and Dang were "gatekeepers." Gatekeepers are prison health officials who serve "solely as a gatekeeper for other medical personnel capable of treating the condition," and they may be held liable if they delay or refuse to fulfill this role. *Self*, 439 F.3d at 1232 (alterations omitted). Though Nurses Blatnick and Dang sometimes were in a position to refer patients to medical personnel capable of providing treatment, neither nurse was a "gatekeeper" in the legal sense because neither performed only that role, and because the claims in this matter do not concern a failure to refer Mr. Rabidue for outside treatment. Their roles were as medical providers.

After March 11, Mr. Rabidue's medical records contained the x-rays showing multiple fractures. Although it was Nurse Blatnick's normal practice to review an inmate's medical records before a meeting with the inmate, she did not do so, and instead counseled him as how a sprain would heal. Of greater concern, she threatened to end the meeting when Mr. Rabidue directed her to his medical records. A reasonable jury could find that her failure to review his

records before their meeting and refusal to review them after being prompted by Mr. Rabidue was conscious, deliberate disregard of his medical condition.

Similarly, the evidence, taken in the light most favorable to Mr. Rabidue, demonstrates a genuine dispute of fact as to Nurse Dang's subjective intent. He told the Nurse Dang that he thought he had broken his foot, *again*. Nurse Dang did not review his records, and instead emphatically refused to approve Mr. Rabidue's requested accommodations. Construing the disputed evidence most favorably to him, she also refused to provide Tylenol and noted on the form she completed that he had a "Finger or toe injury" that did not require immediate treatment by an outside provider. The Court finds that a reasonable jury could find Nurse Dang's conduct to be subjectively indifferent.

Thus, the only *prima facie* indifference claim is against Nurses Blatnick and Dang for their conduct after March 11.

**D.    Clearly Established Analysis**

Neither party makes anything beyond conclusory arguments on the applicable clearly established law. The Court is nevertheless obligated to determine whether the law is clearly established or not. Mindful that the law must be clearly established in a "particularized" sense, the Court looks to the specific conduct for which Mr. Rabidue has established a *prima facie* claim.

The particularized questions as to Nurse Blatnick are whether a medical professional has an obligation to review her records and whether a medical professional is deliberately indifferent in ending a meeting early. Mr. Rabidue points only to cases establishing that fractured bones are serious enough to warrant treatment. Mr. Rabidue was, of course, receiving treatment, and he sought the meeting with Nurse Blatnick to complain about that treatment. The Court is unable to locate any case law, much less any clearly established law, finding medical professionals

13

deliberately indifferent for failing to review medical records or ending a meeting early.

The particularized question as to Nurse Dang is whether, in response to a worsening injury, a medical professional may deny all treatment in deference to an appointment with a specialist occurring in the future. An Eighth Amendment claim is actionable when "a medical professional recognizes an inability to treat [a] patient due to the seriousness of the condition and his corresponding lack of expertise but nevertheless declines or unnecessarily delays referral." *Self*, 439 F.3d at 1232. Thus, Nurse Dang had reasonable notice that denying Mr. Rabidue all treatment including medication or hastening the specialist appointment could be a constitutional violation. The Court therefore finds that Mr. Rabidue's claims can proceed against Nurse Dang but not against Nurse Blatnick.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (**# 96**) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the motion is **GRANTED** as to Nicole Blatnick, Tina Rosler, and Alvin Massenburg. No party having requested certification of judgment pursuant to Rule 54(b), and the Court finding it imprudent to do so at this time, judgment shall not enter against these Defendants until the conclusion of proceedings against all remaining Defendants. Mr. Rabidue's claim against Jennifer Novatny is **DISMISSED, with prejudice**.[8] The motion is **DENIED** as to Hong Dang; Mr. Rabidue's claim against her shall proceed to trial. The parties jointly will contact chambers within 14 days to schedule a final pretrial conference.

---

[8] The claims against Defendants Sicotte, Long, Martinez, and Falk have been previously dismissed. # 59, # 67.

Mr. Rabidue shall also show cause within 14 days why his claim against Deputy Director of Prisons John Doe should not be dismissed.

Dated this 17th day of August, 2017.

**BY THE COURT:**

Marcia S. Krieger
United States District Court